1  Richard Lyon (Cal. Bar No. 229288)
   rick@dovel.com
2  Jonas B. Jacobson (Cal. Bar No. 269912)
   jonas@dovel.com
3  Simon Franzini (Cal. Bar No. 287631)
   simon@dovel.com
4  DOVEL & LUNER, LLP
   201 Santa Monica Blvd., Suite 600
5  Santa Monica, California 90401
   Telephone: (310) 656-7066
6  Facsimile: (310) 656-7069
7

8  David A. Neiman
   dneiman@rblaw.net
9  ROMANUCCI & BLANDIN, LLC
   321 North Clark Street, Suite 900
10 Chicago, IL 60654
   Telephone: (312) 458-1000
11 Facsimile: (312) 458-1004
12

13 *Attorneys for Plaintiff*

14

15                **UNITED STATES DISTRICT COURT**
16               **EASTERN DISTRICT OF CALIFORNIA**

17
   Echo & Rig Sacramento, LLC, individually      Case No.  2:23-cv-00197-DJC-JDP
18 and on behalf of all others similarly
   situated,                                     **FIRST AMENDED CLASS ACTION**
19                                               **COMPLAINT**
            *Plaintiff*,
20                                               **JURY TRIAL DEMANDED**

21 v.

22 AmGUARD Insurance Company,

23

24          *Defendant.*

25

26

27

28

First Amended Class Action Complaint                    Case No. 2:23-cv-00197-DJC-JDP

**Table of Contents**

I.      Introduction...................................................................................................................... 1

II.     Parties. ............................................................................................................................. 3

III.    Jurisdiction and venue. ................................................................................................... 3

IV.     Additional allegations. .................................................................................................... 4

      A.      COVID-19, ensuing health orders, and social distancing mandates caused
             California businessowners, including AmGuard policyholders like Echo & Rig,  to
             decrease their business operations.................................................................. 4

      B.      AmGuard was aware that (1) its businessowner policyholders' premiums were
             determined based on pre-COVID-19 information and thus provided AmGuard
             with an inflated rate of return, and (2) California public policy required AmGuard
             to lower or refund its premiums accordingly. .................................................. 6

      C.      AmGuard unfairly collected and retained excessive premiums calculated based on
             its policyholders' pre-COVID-19 operations instead of reducing and refunding
             the premiums to account for its policyholders' diminished operations. .............................. 11

V.      Class action allegations................................................................................................ 12

VI.     Claims ........................................................................................................................... 14

      Count 1: Unjust Enrichment.......................................................................................... 14

      Count 2: Violation of Business and Professions Code § 17200, et seq. .......................... 15

VII.    Jury Demand.................................................................................................................. 16

VIII.   Prayer for Relief. ........................................................................................................... 16

## I.    Introduction.

1.    California public policy limits commercial property and casualty insurers like Defendant AmGuard Insurance Company ("AmGuard") to a fair rate of return based on the premiums they collect from their policyholders.  But, at a time when the COVID-19 pandemic and the attendant public health orders forced insured businesses to shutter or drastically cut operations, AmGuard disregarded this policy.  AmGuard collected and retained excessive insurance premiums, resulting in an inflated rate of return.  AmGuard unjustly profited.  And its businessowner policyholders, like Plaintiff Echo & Rig, were harmed.  This case seeks to remedy AmGuard's unfair business practice.

2.    Premiums for businessowner's insurance are properly calculated based on the risks associated with the volume and nature of a business's operations.  If a business has larger operations— more employees or more customers patronizing the business—then the potential for an insured event increases and the insurer faces more risk.  To maintain a fair rate of return, insurance companies like AmGuard account for the increased risk by charging higher premiums.

3.    Conversely, if a businessowner policyholder has diminished operations—fewer employees and fewer customers (or none at all) patronizing its business—then the potential for an insured event decreases and the insurer faces less risk.  To maintain a fair rate of return, the insurance company must account for the decreased risk and lower or refund premiums accordingly.  Failure to do so will result in an inflated rate of return, unjustly enriching the insurance company and harming the insured.

4.    When COVID-19 began to spread in March 2020, California enforced strict social distancing measures to slow its spread.  California citizens were ordered to shelter in place and only venture outside for essentials.  This forced California businesses—including those insured by AmGuard—to drastically reduce or shut down their operations.  Prior to the pandemic, Plaintiff Echo & Rig, a successful restaurant in Sacramento, had annual revenues of over $6 million and roughly 80 employees.  Beginning in mid-March 2020, Plaintiff was forced to shut down its business and furlough its entire staff.  For the months of April, May, July, and August in 2020, Plaintiff had no operations, no employees, and no revenue.  And for the remainder of 2020, it had minimal operations with an employee base that never exceeded 20% of its pre-COVID staff.   During this period of drastically reduced (or

nonexistent) operations, Plaintiff was far less likely to experience an insured event, and AmGuard faced significantly less risk.  To maintain a fair rate of return, AmGuard needed to lower premiums accordingly or issue appropriate refunds to Plaintiff, and to all similarly situated policyholders.

5.      The California Department of Insurance confirmed this.  Through a series of four formal bulletins issued during 2020 and 2021 (Exhibits 2-6), the California Insurance Commissioner repeatedly ordered insurance companies to provide partial refunds or other monetary relief, such as credits or dividends, to their California policyholders because of their lower loss exposures during the pandemic. Each bulletin put AmGuard on notice that their then-current rates were excessive.  Nonetheless, AmGuard failed to provide the requisite monetary relief.

6.      For example, in April 2020, Insurance Commissioner Ricardo Lara issued a bulletin to "All Property and Casualty Insurers," including AmGuard, recognizing that "the COVID-19 pandemic … [had] severely curtailed activities of policyholders in both personal and commercial lines," so that "projected loss exposures of many insurance policies have become overstated or misclassified."  Exhibit 2 (2020-3 Bulletin) at 1.  "To protect consumers and to provide consistent direction to the insurance industry regarding misclassifications of risk resulting from the COVID-19 pandemic," Commissioner Lara ordered "insurers to make an initial premium refund … to all adversely impacted California policyholders," for "Commercial liability insurance" and "Any other line of coverage where the measures of risk have become substantially overstated as a result of the pandemic," which included Plaintiff and similarly situated businesses.  *Id* at 1-2.

7.      But AmGuard failed to do so.  Plaintiff, like many other similarly situated businesses insured by AmGuard, was an adversely impacted California policyholder.  Because of the social distancing and stay-at-home measures in effect in California, Plaintiff had either minimal operations or no operations at all for nine of the twelve months that its businessowner's policy with AmGuard was in place.  And yet it continued to pay 100% of its premiums.  Despite full knowledge of the facts, AmGuard never adjusted Plaintiff's premiums to account for Plaintiff's decreased operations and AmGuard's decreased risk.  No price reduction, and no refunds.   Instead, AmGuard collected and retained excessive premiums from Plaintiff, just as it did from numerous other similarly situated businesses.

8.      Because the rates charged by AmGuard were well in excess of a fair rate of return and

AmGuard failed to provide appropriate refunds, AmGuard experienced an unjust windfall.  And AmGuard's businessowner policyholders, who were already suffering diminished operations, were further harmed by AmGuard's excessive premiums.

9.    This lawsuit does not challenge the approved rates, the ratemaking process, or the established fair rate of return.  The rates were established before anyone anticipated a pandemic that would shutter business operations and render the rates excessive.  But, once business operations were curtailed and the rates became excessive, AmGuard failed to take necessary remedial actions.  This lawsuit seeks recovery of AmGuard's excessive and unfair premiums.

10.   Accordingly, Plaintiff, on behalf of itself and others similarly situated, seeks to remedy AmGuard's unfair business practices under California's unlawful competition law through disgorgement, restitution and constructive trust as to the excessive, unfair premiums, along with other available relief.

**II.    Parties.**

11.   Plaintiff Echo & Rig Sacramento, LLC ("Echo & Rig") is, and at all relevant times described herein was, a California limited liability company, with its principal place of business in Sacramento, California.  Echo & Rig is a full-service restaurant located at 500 J Street, Ste. 150, Sacramento, CA 95814.  Echo & Rig has two owners: (1) Goat Restaurant Management LLC (GRMLLC), a California limited liability company based in Nevada, which is owned by Samuel Jay Martin, a resident of California; and (2) Global Mina LTD Co., a Texas limited liability company based in Texas, which is owned by George Markantonis and Demos Markantonis, who reside in Nevada.

12.   From November 12, 2019 to November 12, 2020, Echo & Rig had a businessowner's insurance policy in place with AmGuard Insurance Company.  Exhibit 1 (Businessowner's Policy).

13.   Defendant AmGuard is a Pennsylvania corporation, with its principal place of business in Wilkes-Barre, Pennsylvania.  AmGuard is one of the five insurance companies that make up the Berkshire Hathaway GUARD Insurance Companies and is an indirect subsidiary of Berkshire Hathaway Inc.  At all relevant times, AmGuard was engaged in the business of selling business insurance products in California and other states.

**III.    Jurisdiction and venue.**

14.   This Court has jurisdiction over this action under 28 U.S.C. § 1332 and the Class Action

Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) this is a class action with a class of more than 100 members; (ii) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (iii) minimal diversity exists because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over AmGuard because it: (i) is authorized to, and has, conducted business in California; (ii) has specifically marketed insurance products in California so as to constitute sufficient minimum contacts; and/or (iii) has sufficiently availed itself of the California markets through the promotion, marketing, and sales of insurance products in this State to render the exercise of jurisdiction by this Court permissible.

16.     Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this District.

**IV.    Additional allegations.**

**A.     COVID-19, ensuing health orders, and social distancing mandates caused California businessowners, including AmGuard policyholders like Echo & Rig, to decrease their business operations.**

17.     The SARS-CoV-2 virus, known as COVID-19, severely impacted the world, including California.  The virus was first detected in Wuhan, China, in December 2019.  By January 2020, the virus was identified as COVID-19.  California declared a state of emergency on March 4, 2020, and the World Health Organization labeled the COVID-19 outbreak a pandemic on March 11, 2020.

18.     Beginning in March 2020, California counties began implementing shelter-in-place restrictions.  On March 15, 2020, residents in counties throughout California were ordered to shelter in place and only go outside for food, medicine and other essentials.  California Governor Gavin Newsom directed bars and nightclubs to close statewide.

19.     On March 16, 2020, the Center for Disease Control and the national Coronavirus Task Force issued guidance for curbing the spread of COVID-19 titled "30 Days to Slow the Spread," which

promoted the adoption of unprecedented social distancing measures.[1]  These measures instructed various subsets of people to "not go to work," "stay home," "keep the entire household at home," and "stay … away from other people."

20.     On March 19, 2020, California health authorities issued statewide shelter-in-place orders. The orders instructed California residents to stay at home and avoid public places except essential services.

21.     Since then, as the virus spread, these orders and similar orders were periodically revised, extended, modified, lifted, and/or reinstated.

22.     The national and statewide health orders caused many California businesses to substantially reduce their operations, or close their doors altogether.  In enacting the Coronavirus Aid, Relief, and Economic Security (CARES) Act, the United States Congress found that approximately 43% of businesses had closed, and nearly all of these closures were due to COVID-19. [2]

23.     For example, the restaurant and foodservice industries in California and nationwide were decimated by COVID-19 and the ensuing health orders.  Prior to the pandemic, in 2019, California restaurants and foodservices provided approximately 1,830,000 jobs across 76,201 locations statewide, which totaled estimated sales of $97.0 billion. [3]

24.     These numbers have decreased drastically.  For example, as of April 2020, over eight million restaurant employees nationally—nearly two thirds of the restaurant workforce—had been laid off or furloughed.[4]  By the end of April 2020, almost 40% of all restaurants across the country were shuttered, and the restaurant and foodservice industry lost over $80 billion in sales.[5]  California businesses were especially hard hit.  In California alone, estimated restaurant job losses as of 2021 from

---

[1]     https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf
[2]     https://www.pnas.org/doi/10.1073/pnas.2006991117
[3]     Nat'l Restaurant Ass'n, California Restaurant Industry at a Glance (2019), available at https://www.senate.ca.gov/sites/senate.ca.gov/files/california_restaurant_statisticspdf.pdf
[4]     https://restaurant.org/education-and-resources/resource-library/restaurants-on-track-to-lose-$80-billion-in-sales-by-end-of-april;-8-million-employees-out-of-work/
[5]     Id.

COVID-19 stood near 1 million.[6]

25.     In California, the pandemic resulted in more than 4.8 million unemployed citizens following business closures and layoffs. Yelp's Economic Impact Report (updated as of December 11, 2020), reported that more than 180,000 California businesses closed at the very beginning of the pandemic. By the end of August 2020, 163,735 California business were still closed and 97,966 businesses were reporting that they would not be reopening.  Even as of February 28, 2022, Yelp's Economic Impact Report reflected that business openings were still slowed in cities across California due to new COVID-19 variants.[7]

26.     Plaintiff was one of many California businesses that saw its business operations decimated by COVID-19 and the ensuing health orders.  At the time when Plaintiff obtained a businessowner's policy from AmGuard (on November 11, 2019), Plaintiff had annual revenues of over $6 million and roughly 80 employees.  Beginning in mid-March 2020, Plaintiff was forced to shut down its business operations and furlough its entire staff.  For the months of April, May, July, and August in 2020, Plaintiff had no operations, no employees, and no revenue.  And for the remainder of the months that Plaintiff's policy with AmGuard was in place (through November 12, 2020), Plaintiff had minimal operations with an employee base that never exceeded 15 people, i.e., 20% of its pre-COVID-19 staff.

**B.     AmGuard was aware that (1) its businessowner policyholders' premiums were determined based on pre-COVID-19 information and thus provided AmGuard with an inflated rate of return, and (2) California public policy required AmGuard to lower or refund its premiums accordingly.**

27.     AmGuard is part of the Berkshire Hathaway Insurance Group, which is the third largest property and casualty insurance conglomerate in California and the second largest in the United States, writing policies generating over $68.3 billion in net premiums in 2021.[8]  During the time when its businessowner policyholders were forced to shutter their businesses during the pandemic, AmGuard and Berkshire flourished.  As reported in its Annual Report, Berkshire's "premiums written increased $369

---

[6]     California Restaurant Ass'n, Restaurants will be the last industry to recover from the pandemic (Mar. 15, 2021), available at https://www.calrest.org/news/restaurants-will-be-last-industry-recover-pandemic
[7]     https://www.yelpeconomicaverage.com/yea-q1-2022.html
[8]     https://www.reinsurancene.ws/top-100-u-s-property-casualty-insurance-companies/

million (3.7%) in 2020 compared to 2019," and "premiums written increased $2.4 billion (23.3%) in 2021 compared to 2020." [9]

28.     AmGuard markets and sells businessowner's insurance policies to California businesses, including through independent agents and brokers.  AmGuard sets premiums based on the anticipated risks associated with the insured business operations.  AmGuard uses various factors in calculating premiums, including the volume and type of business giving rise to the expected risks, the number of customers that frequent the business, and the type of work employees conduct at the premises.  And AmGuard requires policyholders, like Plaintiff, to provide accurate detailed information regarding its past and expected business operations and income.

29.     The information provided by a prospective policyholder allows AmGuard to assess the risk associated with insuring that business and to determine its premiums accordingly.  For example, if a business has larger operations—more employees or more customers patronizing the business—then the potential for an insured event increases, the insurer faces more risk, and the premiums will be higher to account for this greater risk.  Conversely, if a business has diminished operations—fewer employees and fewer customers (or none at all) patronizing its business—then the potential for an insured event decreases, the insurer faces less risk, and the premiums should be lower.

30.     Plaintiff provided the required information to AmGuard, and AmGuard issued Plaintiff a businessowner's policy on November 13, 2019.  At that time, AmGuard and Plaintiff were unaware that the COVID-19 pandemic and ensuing health orders would substantially reduce or eliminate the operations of California businesses, including Plaintiff's.

31.     After the COVID-19 pandemic began and the health orders were entered, AmGuard became aware that the COVID-19 pandemic and ensuing health orders substantially reduced or eliminated the operations of many businessowner policyholders throughout California.  AmGuard was also aware that, when it calculated premiums for these businessowner policyholders before the pandemic, AmGuard had not contemplated or incorporated into its premiums that the policyholders' businesses would cease to operate or that their operations would be severely reduced.

---

[9]     https://www.berkshirehathaway.com/2021ar/2021ar.pdf

32.     After the onset of COVID-19 in March 2020, many AmGuard businessowner policyholders had fewer employees, less inventory, and fewer customers (or none at all) patronizing their businesses.  This reduced the potential for an insured event and decreased AmGuard's risk.  To maintain a fair rate of return, AmGuard needed to account for the decreased risk and reduce or refund premiums accordingly.  Failure to do so would result in an inflated rate of return, unjustly enriching AmGuard and harming its policyholders.

33.     This is required by long-standing California public policy limiting insurance premiums and rates to a fair rate of return on the risk covered by the policy.  This public policy is confirmed by California Proposition 103, the California Code of Regulations, and the Orders of the California Department of Insurance.  AmGuard has been aware of this public policy at all relevant times.

34.     In 1988, Californians voted Proposition 103 into law by referendum to uphold this public policy: "to protect consumers from arbitrary insurance rates and practices" and "to ensure that insurance is fair, available, and affordable for all Californians." [10] The Proposition set forth that it "shall be liberally construed and applied in order to fully promote its underlying purpose." [11]

35.     According to the California Insurance Code, "No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter." California Insurance Code 1861.05(a).  Insurers are limited to a fair rate of return, i.e., a profit limited to what an investor can reasonably expect to earn from an investment that has comparable risks in a business other than insurance. 10 Cal. Code Reg. § 2644.16; 10 Cal. Code Reg. § 2644.2.  The Regulations further explain that an excessive rate of return, which an insurer cannot earn, is a return that exceeds a fair rate of return.  10 Cal. Code Reg. § 2644.1.

36.     In a series of bulletins following the outbreak of COVID-19, the California Department of Insurance (DOI) confirmed the policy that insurers are limited to a fair rate of return.  The DOI declared that, because policyholders were forced to decrease business operations during COVID-19, insurance companies like AmGuard were receiving an excessive rate of return.  The DOI further declared that policyholders were entitled to a refund and/or reduced premiums.

37.     On April 13, 2020, the DOI issued a bulletin to "All Property and Casualty Insurers,"

---

[10]     https://www.consumerwatchdog.org/feature/text-proposition-103
[11]     Id.

First Amended Class Action Complaint          8          Case No. 2:23-cv-00197-DJC-JDP

including AmGuard, recognizing that "the COVID-19 pandemic caused an unprecedented challenge for California's businesses" and had "severely curtailed activities of policyholders in both personal and commercial lines," so that "projected loss exposures of many insurance policies have become overstated or misclassified."  Exhibit 2 (2020-3 Bulletin) at 1. [12]

38.     "To protect consumers and to provide consistent direction to the insurance industry regarding misclassifications of risk resulting from the COVID-19 pandemic," Insurance Commissioner Ricardo Lara ordered "insurers to make an initial premium refund for the months of March and April to all adversely impacted California policyholders," including those in commercial liability insurance, "as quickly as practicable, but in any event no later than 120 days after the date of this Bulletin," i.e., August 11, 2020. *Id.* at 1-2.  Commissioner Lara "grant[ed] each insurer reasonable flexibility in determining how best to quickly and fairly accomplish the refund of premium to policyholders," adding that "[i]nsurers may comply with the premium refund order by providing a premium credit, reduction, return of premium, or other appropriate premium adjustment." *Id.* at 2. "Insurers may refund premium without prior approval by the [DOI] if they apply a uniform premium reduction for all policyholders in an individual line of insurance, for recent, current, and upcoming policy periods or any portion thereof."  *Id.*

39.     "Alternatively, insurers may refund premium without prior approval by the [DOI] by reassessing the classification and exposure bases of affected risks on a case-by-case basis for recent, current, and upcoming policy periods or any portion thereof." *Id.* "Whether choosing one of the above-described approaches, or an alternative approach, insurers shall, no later than 120 days after the date of this Bulletin, provide each affected policyholder, if applicable, with a notification of the amount of the refund, a check, premium credit, reduction, return of premium, or other appropriate premium adjustment." *Id.* at 3. Commissioner Lara also ordered every insurer "to report to the [DOI] within 60 days . . . all actions taken and contemplated future actions to refund premiums in response to or consistent with this Bulletin." *Id.*

40.     On May 15, 2020, the DOI issued a second bulletin, extending "the directives set forth in Bulletin 2020-3 to reduce premium in the affected lines of insurance where the projected loss exposures

---

[12]     Paragraphs 37-44 of this Complaint mirror the summary of the "DOI Bulletins" provided by Judge Orrick in *Boobuli's Llc v. State Farm Fire & Cas. Co.*, 562 F. Supp. 3d 469, 474-75 (N.D. Cal. 2021).

have become overstated or misclassified . . . through May 31, 2020." Exhibit 3 (2020-4 Bulletin) at 2. The 2020-4 Bulletin also required insurers to report to the DOI "information with respect to any premium adjustments for May 2020." *Id.*

41.     On June 25, 2020, the DOI issued a third bulletin, extending the directives and reporting requirements of the previous two bulletins to June 2020 and to "any months subsequent to June if the COVID-19 pandemic continues to result in projected loss exposures remaining overstated or misclassified." Exhibit 4 (2020-8 Bulletin) at 2. The 2020-8 Bulletin clarified that, "[t]he extension of reporting required by this Bulletin 2020-8 does not change the previous deadline for insurers to provide direct relief to policyholders for March, April, and May premiums by no later than August 11, 2020." *Id.*

42.     On December 3, 2020, the DOI amended Bulletin 2020-8 to extend the directives and reporting requirements set forth in Bulletins 2020-3 and 2020-4 "to include premium relief for any months subsequent to June as conditions warrant." Exhibit 5 (2020-8 Amended Bulletin) at 1.

43.     On March 11, 2021, the DOI issued Bulletin 2021-3, reporting that "[t]o date, private passenger automobile insurance companies have returned more than $1.75 billion in premium for 2020 to California drivers," but "based on extensive analysis of data received, the Department's review of this loss data demonstrates the premium relief that insurance companies provided to their policyholders was insufficient, leaving consumers paying inflated premiums while they continue to experience reduced risk of loss." Exhibit 6 (2021-3 Bulletin) at 1.

44.     Thus, the 2021-3 Bulletin "directs insurance companies," to take the following actions: (i) "Do more to return additional premium relief from March 2020 forward, and report these additional premium returns to the Department"; (ii) "Communicate with their policyholders about how they will return premiums, as well as options available to consumers to reduce their ongoing premium"; and (iii) "Consult this bulletin when seeking clarification regarding the directives and reporting requirements set forth here and in Bulletins 2020-3, 2020-4, and 2020-8." *Id.*

45.     Through this series of formal Bulletins, the California Insurance Commissioner put AmGuard on notice that its then-current rates were excessive. Despite these Bulletins, AmGuard failed to put in place and execute a refund program that was adequate to compensate its policyholders like Plaintiff for their overpayments.

**C.** **AmGuard unfairly collected and retained excessive premiums calculated based on its policyholders' pre-COVID-19 operations instead of reducing and refunding the premiums to account for its policyholders' diminished operations.**

46. As detailed above, Plaintiff and other similarly situated businesses paid premiums to insure against the risk associated with pre-COVID-19 business operations, even after the insured business operations had ceased or had been substantially reduced. This resulted in AmGuard collecting and retaining excessive, unfair premiums in violation of California public policy. Despite AmGuard's policyholders' dramatic decrease in insured business operations caused by the COVID-19 pandemic, AmGuard failed to reduce premiums fairly or refund the excess premiums reflecting the absent or decreased insured risks.

47. In response to Bulletins 2020-03 and 2020-04—which required AmGuard to provide a "refund, a check, premium credit, reduction, return of premium, or other appropriate premium adjustment" because of "overstated" premiums due to COVID-19 from March 15 through May 31, 2020 (Exhibit 3 at 2), AmGuard stated that it "provided refunds of between 15% and 30% to policyholders for [the period between March 15 through May 31, 2020], depending on the line of business and classification, with some exceptions." Exhibit 7 (AmGuard's Response) at 1.

48. There are two problems with AmGuard's response. First, the purported refunds do not sufficiently account for the reduced operations of policyholders. Echo & Rig, like many other businesses, was altogether closed during these months. Echo & Rig had no operations. No employees. No customers. The reduction in risk to AmGuard from Echo & Rig's businessowner's policy—and the corresponding reduction in premiums needed to maintain a fair rate of return—far exceeded 15% to 30%. Second, AmGuard failed to provide the purported refunds. Echo & Rig's business was altogether closed from March 15, 2020, through May 31, 2020. But it did not receive a 15% to 30% refund. It did not receive any refund at all. AmGuard failed to provide Plaintiff any reduced premium, any refund, any notification, or any explanation.

49. In response to Bulletin 2020-08—which extended the refund directive through June 2020 and to "any months subsequent to June if the COVID-19 pandemic continues to result in projected loss exposures remaining overstated or misclassified," Exhibit 3 at 2, AmGuard stated that it would not offer

to its policyholders a uniform "premium refund for the months of September, October, November or December" and instead would undertake a "case-by-case reassessment of exposure bases" on the requests of individual policyholders.  Exhibit 7 at 1.  AmGuard's stated policy and its implementation of that policy failed to adequately account for the reduced operations of its policyholders during this time period.  For example, Plaintiff had no operations for some of these "subsequent" months and minimal operations during others.  Although AmGuard's loss exposures remained overstated for these months, AmGuard did not provide Plaintiff with a reduced premium or refund.  Nor did AmGuard provide any notification, explanation, or opportunity to provide information regarding Plaintiff's reduced operations and entitlement to a refund and reduced premiums.

50.     AmGuard's collection and retention of such excessive premiums violates California public policy and contravenes Proposition 103's mandate to protect consumers from arbitrary insurance practices and to ensure that insurance is fair, available, and affordable for all.

51.     AmGuard's collection and retention of returns in excess of a fair rate of return also violates California's laws against unfair business practices under section 17200 of the Business and Professions Code.

52.     Plaintiff seeks to restore excessive, unfair premiums (and the earnings thereon), through disgorgement, restitution and a constructive trust.

**V.     Class action allegations.**

53.     Plaintiff brings its claims individually and on behalf of the following class: All persons who paid insurance premiums to AmGuard for businessowner's insurance policies covering operations after March 15, 2020, whose California business operations were substantially reduced or eliminated due to the COVID-19 pandemic.

54.     The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's

counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any excluded persons.

*Numerosity*

55.     The proposed class contains members so numerous that separate joinder of each member of the class is impractical.  Class members can be readily identified, including though records maintained by AmGuard.

*Commonality*

56.     There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation:

- Whether AmGuard's practice of charging and retaining excess premiums during the COVID-19 pandemic was "unfair" within the meaning of section 17200 of the Business and Professions Code; and

- Whether Class members lost money or property as a result of AmGuard's unfair business practice in violation of section 17200 of the Business and Professions Code.

- Whether the members of the Class paid excessive premiums to AmGuard;

- Whether AmGuard failed to fairly take into account the substantial reduction in its policyholders' insured business operations and AmGuard's corresponding reduction in risk during the COVID-19 pandemic when determining premiums or refunds on premiums;

- Whether the members of the Class are entitled to recover the premiums paid in excess of the amounts allowed by California public policy given the reduction in their insured business operations and AmGuard's corresponding reduction in risk, plus interest;

- The appropriate nature of and procedure for providing class-wide relief.

*Typicality*

57.     Plaintiff's claims are typical of the claims of the Class.  Plaintiff, like other Class members, has paid premiums that exceed AmGuard's fair rate of return for the risk taken.  Plaintiff's claims therefore arise from a common course of conduct by AmGuard and are based on the same legal theories. Proof of a common or single state of facts will establish the right of each member of the Class to judgment because AmGuard's practice violates California law and public policy, as stated herein, and will

1   be applicable to all members of the Class.  Upon application by Plaintiff's counsel for certification of the

2   class, as and where necessary as to the following causes of action, the Court may be requested to also

3   incorporate subclasses in the interests of justice and the judicial economy.

4       *Predominance and Superiority*

5       58.     A class action is superior to other available means for the fair and efficient adjudication of

6   this controversy since individual joinder of all members of the class is clearly impractical.  Class action

7   treatment will permit a large number of similarly situated persons to prosecute their common claims in a

8   forum simultaneously, efficiently, and without the necessary duplication of effort and expense that

9   numerous individuals claim filings and actions would engender.  Furthermore, given that the restitution

10  amount suffered and/or demanded by each individual member of the class may be relatively small, the

11  expenses and burden of individual litigation would make it difficult or impossible for individual members

12  of the class to redress the wrongs done to them.  Moreover, individualized claims and litigation would

13  present the potential for inconsistent or contradictory outcomes. The class action device presents fewer

14  management difficulties, requiring only a single adjudication of the complex legal and factual issues in

15  this dispute, thereby providing the benefits of economy of scale and comprehensive supervision by a

16  single court.

17  **VI.    Claims**

18                          **Count 1: Unjust Enrichment**

19                          **(on behalf of Plaintiff and the Class)**

20      59.     Plaintiff realleges and incorporates by reference all of the foregoing paragraphs as if set

21  forth herein.

22      60.     Plaintiff and the Class purchased businessowner's insurance policies from AmGuard

23  Insurance Company, covering risks faced by Plaintiff's business operations.

24      61.     Plaintiff and the Class submitted insurance applications describing among other things,

25  their business operations, revenue, and other details to enable AmGuard to evaluate the risk of covering

26  Plaintiff and Class members' respective business operations and set a premium allowing a fair rate of

27  return as authorized under California public policy.  Plaintiff and Class members also agreed to subject

28  their businesses to audits to verify the accuracy of representations regarding the type, volume and

location of insured business operations.

62.     As a result of the COVID-19 pandemic and ensuing health orders, the insured business operations of Plaintiff and the Class decreased dramatically, but AmGuard continued to charge and collect excessive, unfair premiums and failed to voluntarily return the excessive, unfair premiums.

63.     AmGuard's collection and failure to refund the excessive, unfair premiums has unjustly enriched it, and Plaintiff and Class members are entitled to restitution of such excessive, unfair premiums and AmGuard's investment returns on those excessive, unfair premiums.  Further, Plaintiff and the Class request a constructive trust on those excessive, unfair premiums (and Defendant's gains on those funds) and an award of their attorney's fees and costs incurred for this matter.

**Count 2: Violation of Business and Professions Code § 17200, et seq.**

**(on behalf of Plaintiff and the Class)**

64.     Plaintiff realleges and incorporates by reference all of the foregoing paragraphs as if set forth herein.

65.     AmGuard provided businessowner's insurance policies to Plaintiff and Class members, insuring against certain risks, most of which were related to the use of their respective commercial premises.  Consistent with California public policy, AmGuard initially charged premiums that covered the risk and presumably included a fair rate of return for the risk insured.

66.     Beginning in mid-March 2020, California authorities issued a series of shelter-in-place orders preventing or significantly reducing the ability of Plaintiff and Class members, through no fault of their own, to operate their respective businesses and conduct business at their respective insured commercial premises.  As a result, the risks insured by AmGuard were substantially reduced.  Despite the substantial reduction in the insured risk, AmGuard continued to charge (and failed to refund) premiums that were calculated based on the pre-pandemic business operations and use of the insured premises. This has resulted in AmGuard charging, receiving, and retaining excessive, unfair premiums in violation of California public policy.

67.     California has a long-standing public policy limiting an insurer's ability to impose rates in excess of a fair rate of return on the insured risk, reflected in California statutes and regulations.

68.     AmGuard's conduct in charging and retaining premiums for a risk that no longer exists,

or has been substantially reduced, violates this vital public policy and the intent of the statutes and regulations designed to ensure that the rates charged by insurers relate to the risk insured and are limited to a fair rate of return on insuring that risk. Plaintiff and Class members' inability to conduct business operations due to the pandemic and ensuing health orders was not one of the factors AmGuard used to calculate insurance rates or premiums. Because it collected and retained premiums calculated based on substantially greater risks than actually existed during the pandemic, AmGuard experienced a windfall. The harm to Plaintiff and the Class substantially outweighs any benefit or utility of Defendant's unfair business practice of collecting excessive, unfair premiums.

69.     Plaintiff and Class members have no adequate remedy at law.

70.     As a result of AmGuard's unfair business practices, Plaintiff and Class members have lost money or property and suffered injury in fact. For example, Plaintiff paid more than $14,000 in premiums to AmGuard based on Plaintiff's pre-COVID-19 business operations. After the substantial reduction or elimination of the insured risks, AmGuard continued to hold and charge excessive, unfair premiums rightfully belonging to Plaintiff (and the Class).

71.     Plaintiff and Class members have been damaged by AmGuard's unfair business practices and are entitled to the relief described below, including the restoration of excessive, unfair premiums charged in violation of California public policy.

**VII.   Jury Demand.**

72.     Plaintiff demands a jury trial on all issues so triable.

**VIII.  Prayer for Relief.**

73.     Plaintiff seeks the following relief individually and for the proposed Class:

- An order certifying the asserted claims, or issues raised, as a class action;
- A judgment in favor of Plaintiff and the proposed Class;
- An order and judgment under the court's equitable powers for disgorgement, restitution and a constructive trust as to the excessive, unfair premiums acquired from Plaintiff and the Class along with any economic gains Defendant derived from investing those excessive, unfair premiums;
- Attorneys' fees;

1

- Pre- and post-judgment interest;

2

- Any additional relief that the Court deems reasonable and just.

3

4

5    Dated: April 20, 2023                            Respectfully submitted,

6

7                                                     By: /s/ Richard Lyon
8                                                     Richard Lyon (Cal. Bar No. 229288)
                                                      rick@dovel.com
9                                                     Jonas B. Jacobson (Cal. Bar No. 269912)
                                                      jonas@dovel.com
10                                                    Simon Franzini (Cal. Bar No. 287631)
                                                      simon@dovel.com
11                                                    DOVEL & LUNER, LLP
12                                                    201 Santa Monica Blvd., Suite 600
                                                      Santa Monica, California 90401
13                                                    Telephone: (310) 656-7066
                                                      Facsimile: (310) 656-7069
14

15                                                    David A. Neiman
                                                      dneiman@rblaw.net
16                                                    ROMANUCCI & BLANDIN, LLC
                                                      321 North Clark Street, Suite 900
17                                                    Chicago, IL 60654
                                                      Telephone: (312) 458-1000
18                                                    Facsimile: (312) 458-1004

19
                                                      Attorneys for Plaintiff
20

21

22

23

24

25

26

27

28